**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHEN KING, derivatively on behalf of ACER THERAPEUTICS INC., | |
| Plaintiff, | Case No.: 1:20-cv-4779 |
| vs. | |
| CHRIS SCHELLING, HARRY PALMIN, JASON AMELLO, STEVE ASELAGE, HUBERT BIRNER, JOHN M. DUNN, MICHELLE GRIFFIN, and LUC MARENGERE, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| ACER THERAPEUTICS INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Stephen King ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Acer Therapeutics Inc. ("Acer" or the "Company"), files this Verified Shareholder Derivative Complaint against Chris Schelling, Harry Palmin, Jason Amello, Steve Aselage, Hubert Birner, John M. Dunn, Michelle Griffin, and Luc Marengere (collectively, the "Individual Defendants," and together with Acer, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Acer, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own

acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Acer, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Acer's directors and officers from September 25, 2017 through June 24, 2019, both dates inclusive (the "Relevant Period").

2.      Based in Newton, Massachusetts, Acer is a clinical-stage pharmaceutical company that develops and commercializes medication aimed at treating certain rare and life-threatening diseases. One of the Company's medications currently under development is EDSIVO, a formulation of the generic drug celiprolol intended to treat vascular Ehlers-Danlos Syndrome ("vEDS"), a rare, and potentially fatal genetic disease. The Company has poured a huge amount of resources into EDSIVO since the Company was founded in 2013, including funding research and purchasing clinical studies into the efficacy of celiprolol in the hopes of obtaining U.S. Food and Drug Administration ("FDA") approval for the drug.

3.      To date, none of the Company's drug candidates have received FDA approval, which is a prerequisite for new drugs to be marketed and sold in the U.S. As such, the Company has yet to generate any revenue, and has incurred losses every year since its founding. In light of

these circumstances, Acer's future as a company depends heavily on whether Acer can obtain FDA approval for any of its products, including EDSIVO.

4.     Strapped for cash, and facing substantial doubts about its ability to continue as a going concern, during the Relevant Period, Acer conducted two secondary public offerings, one in December 2017, and the other in August 2018 (respectively, the "December 2017 Offering" and the "August 2018 Offering") in order to raise the funds the Company desperately needed to sustain its operations and continue development of its drug candidates.

5.     In prospectus supplements issued in connection with these offerings, as well as in the Company's other SEC filings and press releases issued throughout the Relevant Period, the Individual Defendants touted EDSIVO and the Company's overall prospects, representing that the Company was collaborating with the FDA and that the new drug application ("NDA") for EDSIVO that the Company had submitted to the FDA would ultimately be approved.

6.     To bolster these representations, the Individual Defendants pointed to, among other things, data gathered through a French clinical trial published in October 2010 involving the use of celiprolol (the "Ong Trial"), as well as data gathered from a long term study of vEDS patients published in April 2019 in the *Journal of the American College of Cardiology* (the "Long Term Observational Study"). Such data supposedly indicated that celiprolol was effective as a treatment for symptoms of vEDS, which therefore supported EDSIVO's approval for use in the U.S.

7.     In reality, both of these studies were severely limited, and did not provide an adequate basis to support FDA approval of EDSIVO. Specifically, the Ong Trial was heavily biased and lacked a sufficient sample size, and the Long-Term Observational Study lacked a control group, making it difficult to asses what, if any, effect celiprolol had on the survivability of the vEDS patients who were monitored in the study.

8.     Given the Company's precarious financial position, the Individual Defendants were highly motivated to conceal any potential defects in the data and underlying studies that supported approval of EDSIVO—and indeed, they neglected to disclose any of the above-described flaws to the investing public. To the contrary, the Individual Defendants misleadingly emphasized—repeatedly—that during a September 2015 meeting with the Company, the FDA had agreed that an additional clinical trial beyond the Ong Trial "is not likely needed," further indicating that the EDSIVO NDA would more than likely be approved.

9.     The truth emerged on June 25, 2019, when the Company disclosed that the FDA had denied the Company's EDSIVO NDA, which the Individual Defendants admitted would require the Company to "conduct an adequate and well-controlled trial" beyond the clearly insufficient Ong Trial, and which would likely be extremely expensive and time-consuming for the Company.

10.     On this news, the Company's stock shed over 78% of its value, tumbling from $19.28 per share at the close of trading on June 24, 2019, to $4.12 per share at the close of trading on June 25, 2019.

11.     Subsequently, on July 5, 2019, the Individual Defendants disclosed that the Company would be implementing a "corporate restructuring" as a result of EDSIVO's rejection by the FDA, which included downsizing its employees and halting pre-commercial activities related to EDSIVO. The Company ultimately attempted to appeal the FDA's decision, but was again denied by the FDA in March 2020.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and

prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) The Ong Trial was substantially biased and underpowered, and would be inadequate to support FDA approval of EDSIVO; (2) The Long-Term Observational study into celiprolol was significantly limited, and would likewise be inadequate to support FDA approval of EDSIVO; (3) the FDA had not "agreed" that further clinical trials for EDSIVO were not needed for the approval of EDSIVO's NDA; (4) due to the foregoing, it was highly unlikely that EDSIVO's NDA would ultimately be approved; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

15.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's President and Chief Executive Officer ("CEO"), and the Company's Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly

over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

16.     In the Securities Class Action, District Judge Gregory H. Woods denied defendants Acer, Chris Schelling, and Harry Palmin's motion to dismiss on June 16, 2020, finding that defendants' statements that the FDA had "agreed" that no additional clinical trials for EDSIVO were necessary for EDSIVO to receive FDA approval were false and misleading. Securities Class Action Order at 15–17, *Skiadas v. Acer Therapeutics Inc., et al.*, Docket No. 1:19-cv-06137-GHW, (S.D.N.Y. June 16, 2020) ("Securities Class Action Order").

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's current directors, of the substantial likelihood of the CEO's liability in the Securities Class Action and the current directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

19.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Acer. Plaintiff has continuously held Acer common stock at all relevant times.

### Nominal Defendant Acer

24.     Acer is a Delaware corporation with its principal executive offices located at One Gateway Center, Suite 351, 300 Washington Street, Newton, Massachusetts 02458. Acer's shares trade on the NASDAQ under the ticker symbol "ACER."

### Defendant Schelling

25.     Defendant Chris Schelling ("Schelling") is the Company's founder, and has served as the Company's President and CEO since September 2017. According to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), as of March 1, 2020, Defendant Schelling beneficially owned 1,796,875 shares of the Company's common stock, which represented 17.7% of outstanding shares of Company stock as of that date. Given that the price per share of the Company's common stock on March 1, 2020 was $3.28, Defendant Schelling owned over $5,893,750 million worth of Acer stock.

26.     For the fiscal year ended December 31, 2018, Defendant Schelling received $550,000 in compensation from the Company, which consisted of $400,000 in salary and a

$150,000 bonus. For the fiscal year ended December 31, 2019, Defendant Schelling received $1,467,211 in compensation from the Company, which consisted of $436,000 in salary and $1,031,211 in option awards.

27.    The Company's 2019 10-K stated the following about Defendant Schelling:

Chris Schelling has served as a director and as our President and Chief Executive Officer since the completion of the Merger in September 2017. Mr. Schelling founded Private Acer in December 2013 and served as a director from that time until the Merger. From December 2013 to February 2016, he served as Private Acer's Chief Operating Officer, and from February 2016 until the Merger, he served as Private Acer's President and Chief Executive Officer. Prior to founding Private Acer, he served as Executive Director of Strategic Marketing at BioMarin Pharmaceutical Inc., a Nasdaq-listed biotechnology company, from May 2006 to October 2012. Mr. Schelling also founded Censa Pharmaceuticals Inc. in 2015 and currently serves as a director. He has also served as a director at Cascade Prodrug, Inc. since June 2017. He has also held roles at Abgenix, Inc., Cell Therapeutics, Inc., Stanford Research Institute Consulting and Organon. Mr. Schelling earned a B.A. in biology and history from Carroll College.

**Defendant Palmin**

28.    Defendant Harry Palmin ("Palmin") has served as the Company's CFO since September 2017, and as its COO since September 1, 2018. Previously, he served as the Company's President and CEO from December 2013 through February 2016. According to the 2019 10-K, as of March 1, 2020, Defendant Palmin beneficially owned 174,000 shares of the Company's common stock, which represented 1.7% of outstanding shares of Company stock as of that date. Given that the price per share of the Company's common stock on March 1, 2020 was $3.28, Defendant Palmin owned approximately $570,720 worth of Acer stock.

29.    For the fiscal year ended December 31, 2018, Defendant Palmin received $429,250 in compensation from the Company, which consisted of $340,000 in salary and an $89,250 bonus. For the fiscal year ended December 31, 2019, Defendant Palmin received $844,441 in

compensation from the Company, which consisted of $382,400 in salary and $462,041 in option awards.

30.     The Company's 2019 10-K stated the following about Defendant Palmin:

Harry S. Palmin has served as our Chief Financial Officer since the completion of the Merger in September 2017 and was appointed to the additional position of Chief Operating Officer in September 2018. From December 2013 to February 2016, Mr. Palmin served as the President, Chief Executive Officer and a director of Private Acer, and from February 2016 to September 2017 he served as Private Acer's acting Chief Financial Officer. Prior to joining Private Acer, he served in a variety of roles at Novelos Therapeutics, Inc., a pharmaceutical company, including as President and director from 1998 to October 2013, Chief Executive Officer from January 2005 to October 2013 and acting Chief Financial Officer from 1998 to September 2005. He has also held roles at Lehman Brothers and Morgan Stanley. Mr. Palmin earned a B.A. in economics from Brandeis University and an M.A. in international economics and finance from the Brandeis University International Business School.

**Defendant Amello**

31.     Defendant Jason Amello ("Amello") has served as a Company director since September 2017. He also serves as a member of the Company's Audit Committee. According to the 2019 10-K, as of March 1, 2020, Defendant Amello beneficially owned 14,250 shares of the Company's common stock. Given that the price per share of the Company's common stock on March 1, 2020 was $3.28, Defendant Amello owned approximately $46,740 worth of Acer stock.

32.     For the fiscal year ended December 31, 2018, Defendant Amello received $42,500 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

33.     The Company's 2019 10-K stated the following about Defendant Amello:

Jason Amello has served as a director since the completion of the Merger in September 2017. Since September 2013, Mr. Amello has served as Senior Vice President, Chief Financial Officer and Treasurer of Akebia Therapeutics, Inc., a Nasdaq-listed biopharmaceutical company. From May 2012 to May 2013, he served as Executive Vice President, Chief Financial Officer and Treasurer of ZIOPHARM Oncology, Inc., a biopharmaceutical company. From April 2000 to June 2011, Mr. Amello held various positions at Genzyme Corporation, a biotechnology company, most recently as Senior Vice President, Corporate Controller, and Chief Accounting Officer. Earlier in his career, Mr. Amello spent

10 years in the business advisory and assurance practice of Deloitte, serving in various roles of increasing responsibility through Senior Manager. He currently serves on the Board of Directors of the New England Baptist Hospital, an orthopedic specialty hospital. Mr. Amello earned a B.A. in accounting from Boston College and is a Certified Public Accountant in the Commonwealth of Massachusetts.

**Defendant Aselage**

34.     Defendant Steve Aselage ("Aselage") has served as the Company's Chairman of the Board since September 2017. He also serves as the Chair of the Company's Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2019 10-K, as of March 1, 2020, Defendant Aselage beneficially owned 51,905 shares of the Company's common stock. Given that the price per share of the Company's common stock on March 1, 2020 was $3.28, Defendant Aselage owned approximately $170,248 worth of Acer stock.

35.     For the fiscal year ended December 31, 2018, Defendant Aselage received $73,750 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

36.     The Company's 2019 10-K stated the following about Defendant Aselage:

Stephen J. Aselage has served as Chairman of the Board since the completion of the Merger in September 2017. From October 2015 until the Merger, Mr. Aselage served as the Chairman of Private Acer's Board of Directors. Most recently, he was President and Chief Executive Officer of Retrophin, Inc., a Nasdaq-listed, biopharmaceutical company, from November 2014 until his retirement in January 2019, and remains a member of its Board of Directors since October 2012. From May 2014 to November 2014, Mr. Aselage served as the Chief Operations Officer and interim Chief Executive Officer of Retrophin. Prior to joining Retrophin, he held a variety of roles at BioMarin Pharmaceutical Inc., a Nasdaq-listed biotechnology company, as Executive Vice President and Chief Business Officer from December 2009 to September 2012 and Senior Vice President of Global Commercial Development from July 2005 to December 2009. He has also held leadership roles at Cell Therapeutics, Inc., Sangstat Medical Corporation, Advanced Tissue Sciences, Inc. and Genentech, Inc. Mr. Aselage earned a B.S. in biology from the University of Notre Dame.

**Defendant Birner**

37.    Defendant Hubert Birner ("Birner") served as a Company director from September

2017 until he resigned on May 17, 2019.

38.    The Company's Schedule 14A filed with the SEC on April 12, 2019 (the "2019

Proxy Statement") stated the following about Defendant Birner:

> Hubert Birner, Ph.D., MBA has served as a director since the completion of the
> Merger in September 2017. From April 2017 until the Merger, Dr. Birner served as
> a member of Private Acer's Board of Directors. Since 2000, he has served in a
> variety of roles for TVM Capital, an independent affiliation of international private
> equity and venture capital firms, where he currently serves as the Managing Partner
> of TVM Capital and TVM Life Science Management. Dr. Birner currently serves
> as the Chairman of the Boards of Directors of Argos Therapeutics, Inc., a Nasdaq-
> listed immuno-oncology company, and NOXXON Pharma N.V., a EuroNext
> Growth Paris-listed biopharmaceutical company, and as a member of the Board of
> Directors of Proteon Therapeutics, Inc., a Nasdaq-listed biopharmaceutical
> company, as well as a number of privately held life science companies. Prior to his
> tenure at TVM Capital, Dr. Birner held roles at Zeneca Group PLC and
> McKinsey & Company. He served as the Vice Chairman of Evotec AG, a Frankfurt
> Stock Exchange-listed company focused on the discovery and development of
> small molecule drugs, from 2005 to 2013, and as a director of Probiodrug AG, a
> Euronext Amsterdam-listed biopharmaceutical company, from 2014 to 2015.
> Dr. Birner earned a Ph.D. in biochemistry from Ludwig-Maximilian University of
> Munich and an MBA from Harvard Business School.

**Defendant Dunn**

39.    Defendant John M. Dunn ("Dunn") has served as a Company director since

September 2017. He also serves as the Chair of the Company's Nominating and Corporate

Governance Committee, and as a member of the Audit Committee. According to the 2019 10-K,

as of March 1, 2020, Defendant Dunn beneficially owned 33,952 shares of the Company's

common stock. Given that the price per share of the Company's common stock on March 1, 2020

was $3.28, Defendant Dunn owned approximately $111,362 worth of Acer stock.

40.    For the fiscal year ended December 31, 2018, Defendant Dunn received $50,000 in

compensation from the Company, which consisted entirely of fees earned or paid in cash.

41.    The Company's 2019 10-K stated the following about Defendant Dunn:

11

John M. Dunn has served as a director since the completion of the Merger in September 2017. From October 2015 until the Merger, Mr. Dunn served as a member of Private Acer's Board of Directors. From November 2014 to April 2019, he served as General Counsel of Vital Therapies, Inc., a Nasdaq-listed biotherapeutic company. Prior to joining Vital Therapies, Mr. Dunn was a consultant from February 2012 to November 2014, an Executive Vice President of Biogen Idec, Inc., now Biogen Inc., a biotechnology company, from November 2003 to January 2012, where he was the head of that firm's corporate venture group, and General Counsel of IDEC Pharmaceuticals from 2002 until its merger with Biogen in November 2003. Mr. Dunn has served as a director of Sharp Healthcare, a nonprofit regional health care delivery system, since 2019. Mr. Dunn earned a B.S. in finance and a J.D. from the University of Wyoming.

**Defendant Griffin**

42.    Defendant Michelle Griffin ("Griffin") has served as a Company director since September 2017. She also serves as the Chair of the Company's Audit Committee, and as a member of the Compensation Committee. According to the 2019 10-K, as of March 1, 2020, Defendant Griffin beneficially owned 14,250 shares of the Company's common stock. Given that the price per share of the Company's common stock on March 1, 2020 was $3.28, Defendant Griffin owned approximately $46,740 worth of Acer stock.

43.    For the fiscal year ended December 31, 2018, Defendant Griffin received $55,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

44.    The Company's 2019 10-K stated the following about Defendant Griffin:

Michelle Griffin has served as a director since the completion of the Merger in September 2017. Since April 2013, Ms. Griffin has served as the Principal of Pacific Biotechnology Consulting Group, a firm providing consulting services to biotechnology companies and their Boards of Directors. Prior to her time with Pacific Biotechnology Consulting Group, Ms. Griffin served from January 2011 to March 2013 as Executive Vice President, Operations and Chief Financial Officer of OncoGenex Pharmaceuticals, Inc. Ms. Griffin has served as a member of the Board of Directors and as Chair of the Audit Committee for publicly traded companies Adaptive Biotechnologies Corporation since March 2019 and for HTG Molecular Diagnostics, Inc. since August 2018. Ms. Griffin previously served as a member of the Board of Directors and as Chair of the Audit Committee for publicly traded companies PhaseRx, Inc. from 2016 until its acquisition by Roivant Sciences GmbH in 2018, OncoGenex Pharmaceuticals, Inc. from 2008 to 2011, and Sonus Pharmaceuticals, Inc. (subsequently acquired by OncoGenex) from 2004 to 2008.

During various periods from 1997 to 2011, she served in the capacity of Chief Financial Officer for Trubion Pharmaceuticals, Inc., Dendreon Corporation and Corixa Corporation. Ms. Griffin earned a B.S. in marketing from George Mason University and an M.B.A. with a specialization in finance and international business from Seattle University.

**Defendant Marengere**

45.     Defendant Luc Marengere ("Marengere") served as a Company director from September 2017 until he resigned on May 17, 2019.

46.     The Company's 2019 Proxy Statement stated the following about Defendant Marengere:

> Luc Marengere, Ph.D. has served as a director since the completion of the Merger in September 2017. From April 2016 until the Merger, Dr. Marengere served as a member of Private Acer's Board of Directors. He serves as Managing Partner of TVM Life Science Venture VII, L.P., a venture capital fund, which he joined in March 2012. From October 2001 to March 2012, Dr. Marengere was a Managing General Partner with VG Partners, a merchant bank. He serves on the Boards of Directors of a number of privately held life science companies. From January 2015 to March 2017, Dr. Marengere served on the Board of Directors of CoLucid Pharmaceuticals, Inc., a Nasdaq-listed biopharmaceutical company. He has also held roles at CDP Capital – Technology Ventures and MDS Capital Corp. Dr. Marengere earned a Ph.D. from the University of Toronto, an M.S. in endocrinology from Queen's University and a B.S. in biochemistry from the University of Ottawa.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47.     By reason of their positions as officers and/or directors of Acer, and because of their ability to control the business and corporate affairs of Acer, the Individual Defendants owed Acer and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Acer in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Acer and its shareholders so as to benefit all shareholders equally.

48. Each director and officer of the Company owes to Acer and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Acer, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

50. To discharge their duties, the officers and directors of Acer were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Acer, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

52. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

53.    To discharge their duties, the officers and directors of Acer were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Acer were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York and the United States, and pursuant to Acer's Policy on Whistleblower Protections and Code of Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Acer conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Acer and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Acer's operations would comply with all

applicable laws and Acer's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

      (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

      (h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.    Each of the Individual Defendants further owed to Acer and the shareholders the duty of loyalty requiring that each favor Acer's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Acer and were at all times acting within the course and scope of such agency.

56.    Because of their advisory, executive, managerial, and directorial positions with Acer, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Acer.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

59. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

60. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Acer was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

61. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Acer, and was at all times acting within the course and scope of such agency.

## ACER'S CODE OF ETHICS

63.     The Company's Code of Ethics states that it "reiterates the standards of conduct and ethical behavior that we have always expected of our directors, officers and employees (collectively, "Representatives" and individually, a "Representative")."

64.     The Code of Ethics further provides that it was designed to promote the following:

- honest and ethical conduct, including the ethical handling of actual and apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company;

- compliance with applicable governmental laws, rules and regulations;

- the prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and

- accountability for adherence to the Code.

65.     In a section titled, "Honest and Candid Conduct," the Code of Ethics states the following:

Representatives are expected to act and perform their duties ethically and honestly with the utmost integrity. Honest conduct is considered to be conduct that is free from fraud or deception. Ethical conduct is considered to be conduct conforming to accepted professional standards of conduct. Ethical conduct includes the ethical

handling of actual or apparent conflicts of interest between personal and professional relationships as discussed below.

66.    In a section titled, "Accuracy of Financial Reports and Other Public Communications," the Code of Ethics states the following:

> The Company, as a public company, is subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations which may be filed with, or submitted to, the SEC and other regulators or disseminated publicly. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

> Senior Financial Officers are responsible for ensuring that the disclosure in the Company's periodic reports is full, fair, accurate, timely and understandable. In doing so, Senior Financial Officers shall take such action as is reasonably appropriate to (i) establish and comply with disclosure controls and procedures and accounting and financial controls that are designed to ensure that material information relating to the Company is made known to them, (ii) confirm that the Company's periodic reports comply with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (iii) ensure that information contained in the Company's periodic reports fairly presents in all material respects the financial condition and results of operations of the Company.

67.    In a section titled, "Compliance with Laws and Regulations," the Code of Ethics states the following:

> It is the Company's policy to comply with all applicable laws, rules, and regulations. It is the personal responsibility of each Representative to adhere to the standards and restrictions imposed by those laws, rules, and regulations. In performing his or her duties, each Representative will endeavor to comply, and take appropriate action within his or her areas of responsibility to cause the Company to comply, with applicable governmental laws, rules, and regulations.

68.    In a section titled, "Monitoring Compliance and Disciplinary Action," the Code of Ethics states the following, in relevant part:

> The Company's management, under the supervision of its Board of Directors or a committee thereof, or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee, shall take reasonable steps from time to time to (i) monitor compliance with the Code, including the establishment of monitoring systems that are reasonably designed to investigate and detect conduct

in violation of the Code, and (ii) when appropriate, impose and enforce appropriate disciplinary measures for violations of the Code.

69.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

70.     Acer is a Massachusetts-based pharmaceutical company that develops and commercializes medication aimed at treating certain rare and life-threatening diseases.

71.     Acer was originally founded in 2013 by Defendant Schelling as a private company. In September 2017, Acer conducted a reverse merger with publicly traded pharmaceutical company Opexa Therapeutics, Inc. ("Opexa"). Upon the completion of the reverse merger on September 19, 2017, Opexa's officers and directors resigned from their positions, and the surviving company, Acer, began trading publicly on the NASDAQ.

72.     The Company currently has three clinical-stage drug candidates in development: ACER-001, a treatment for certain inborn metabolic disorders, Osanetant, a treatment for induced Vasomotor symptoms, and EDSIVO (celiprolol), a treatment for vEDS in patients with a confirmed type III collagen (COL3A1) mutation.

73.     Each of the Company's drug candidates are still undergoing clinical trials, and the Company has yet to generate any revenue from commercial sales. As such, the Company's prospects depend significantly on whether or not the Company can obtain FDA approval of its drug candidates and begin marketing them to the public. As an illustration, the Company included the following in the 2019 10-K's discussion of the risks facing the Company:

> ***We have a limited operating history and have incurred significant losses since our inception and anticipate that we will continue to incur losses for the foreseeable future and may never achieve or maintain profitability. The absence of any commercial sales and our limited operating history make it difficult to assess our future viability.***
>
> We are a development-stage pharmaceutical company with a limited operating history and a history of losses. Pharmaceutical product development is a highly speculative undertaking and involves a substantial degree of risk. We are focused principally on repurposing and/or reformulating existing drugs for serious rare and life-threatening diseases with significant unmet medical needs. We are not profitable and have incurred losses in each year since inception. We have only a limited operating history upon which you can evaluate our business and prospects. In addition, we have limited experience and have not yet demonstrated an ability to successfully overcome many of the risks and uncertainties frequently encountered by companies in new and rapidly evolving fields, particularly in the pharmaceutical industry. We have not generated any revenue to date. We continue to incur significant research and development and other expenses related to our ongoing operations. Our net loss for the years ended December 31, 2019 and 2018 was $29.4 million and $21.3 million, respectively. As of December 31, 2019, we had an accumulated deficit of $76.3 million. We expect to continue to incur losses for the foreseeable future as we continue our development of, and seek marketing approvals for, our product candidates.

(Emphasis in original.)

74.     EDSIVO, which is the brand name the Company has assigned to its celiprolol candidate, is purportedly the Company's most advanced product candidate. Celiprolol is currently used in the European Union as a treatment for hypertension and vEDS—however, the drug has not been FDA approved, and until it receives such approval, its sale is prohibited in the U.S.

75.     vEDS is a rare genetic disorder affecting thousands of people in the U.S. People suffering from vEDS have abnormally fragile blood vessels, which can result in a number of fatal conditions, such as aneurysms, vascular ruptures, arterial dissections, and more. Due to the rarity of vEDS, in January 2015, the FDA approved "Orphan Drug Exclusivity" status for EDSIVO, which provides seven years of marketing exclusivity for a drug intended to treat rare conditions—contingent upon such drug first being approved by the FDA. Analysts reporting on the Company have estimated that if EDSIVO receives FDA approval, the Company could charge vEDS patients as much as $100,000 per year for the drug.

76.     Since 2013, the Company has spent approximately $23.6 million researching and developing EDSIVO in the hopes of receiving FDA approval for the drug. These research and development efforts have included the Company's purchase of data from the Ong Trial, as well as data from the Long-Term Observational Study.

**The Ong Trial and the Long-Term Observational Study**

77.     On December 13, 2016, Acer announced that it had purchased exclusive rights to access and use data from the Ong Trial conducted by Assitance Publique – Hôpitaux de Paris, Hôpital Européen Georges Pompidou ("AP-HP"), a large French university hospital trust.

78.     The Ong trial was a multicenter, randomized clinical trial based on data gathered by AP-HP researchers in 2004 from vEDS patients. The objective of the trial, which was funded by the French Ministry of Health, was to determine the efficacy of celiprolol as a means of lowering the risks of arterial dissection and vascular rupture in vEDS patients. 53 patients took part in the Ong Trial at centers in France and Belgium, and the results of the trial were ultimately published in October 2010 in *The Lancet*, a well-known, peer-reviewed general medical journal.

79.     The 2019 10-K described the results of the Ong Trial as follows:

Fifty-three participants were enrolled in the Ong trial and randomized at eight centers in France and one center in Belgium. Patient ages ranged from 15 to 65 (with a mean age of 35), with a female-to-male ratio of 2-to-1. Patients were randomly assigned to a five-year intervention, receiving either celiprolol or no treatment, with important phenotype characteristics equally balanced between the celiprolol group and the control group. Celiprolol was administered twice daily to patients in the celiprolol group and the dosage was up-titrated every six months by 100 milligrams per day to a maximum of 400 milligrams per day. Patients assigned to the control group received the same attention as those assigned to the celiprolol group but did not receive celiprolol or any beta blocker. Thirty-three of the 53 patients participating in the study had proven mutations in the COL3A1 gene. Of those patients with proven mutations, demographic and arterial characteristics did not differ from those of the study population as a whole. The duration of follow-up was five years or until the first qualifying cardiac or arterial event. The primary endpoint was a composite of cardiac or arterial events (rupture or dissection, fatal or not) during follow-up. Secondary endpoints were gastrointestinal or uterine rupture. The study was ended early after a consensus decision of the safety monitoring board, the methodologist of AP-HP, and the principal investigator because significant differences were recorded between the treatment group and the control group after 64 months.

* * *

The hazard ratio ("HR") for event-free survival, was 0.36, (95% CI 0.15—0.88; p=0.040), meaning that with celiprolol the risk of having a cardiac or arterial event was reduced by 64% compared to control.

80.     However, the Ong Trial was in fact severely flawed, and its results were therefore unreliable. For starters, there was a substantial imbalance between the treatment group and the control group of patients in the trial—specifically, 12 out of the 25 patients in the treatment group did not possess the COL3A1 mutation that causes vEDS, whereas only 8 out of the 28 patients in the control group did not have the COL3A1 mutation. Due to this imbalance, the treatment group had a roughly 19% head start, or a 5-event advantage (an event being a vascular rupture or arterial dissection) over the control group towards event-free survival (i.e., progressing through the trial without suffering any rupture or dissection). In light of the fact that an 8-event advantage in a clinical trial is generally considered to be statistically significant, any outcome in the Ong Trial in which there are at least three fewer events among the 13 patients with the mutation in the treatment

group than among the 20 patients with the mutation in the control group would result in a statistically significant survival advantage for the treatment group. For this reason, the Ong Trial was biased from the start in favor of indicating that celiprolol could increase patients' rate of survival.

81.     The Ong Trial was also underpowered, in that only 33 patients in the trial possessed the COL3A1 mutation, which was an inadequate sample size to test for meaningful differences between the treatment group and the control group.

82.     Furthermore, the Ong Trial was a retrospective study, as it was based on an analysis of historical data. As the Individual Defendants likely would have been aware, the FDA has a demonstrated preference for prospective, rather than retrospective studies, and the FDA likely would have viewed the retrospective nature of the Ong Trial as an additional source of bias.

83.     These and other red flags indicating the fallibility of the Ong Trial are corroborated by an independent expert cited to in the Securities Class Action, who opined, among other things, that each of the above-described flaws in the Ong Trial were red flags that the FDA would have immediately recognized upon reviewing the trial data.

84.     Additionally, an article published by Pharmaceutical Technology on its website on January 28, 2019 commented on the various insufficiencies of the Ong Trial, stating the following, in relevant part:[1]

> Acer Therapeutics' Edsivo (celiprolol) is not expected to win approval from the US Food and Drug Administration (FDA) for vascular Ehlers-Danlos syndrome (vEDS), as the registrational trial was too small and not well-controlled, according to experts.

* * *

---

[1] https://www.pharmaceutical-technology.com/comment/ehlers-danlos-syndrome-treatment/ (last visited June 22, 2020).

Other experts interviewed said that given the trial comprised of 53 patients, the Phase IV trial (NCT00190411) was too small even for a rare disease like vEDS.

\* \* \*

The study that the approval of Edsivo would be based on was not well-designed, with an overall small trial size, said vEDS expert Dr Harry Dietz, Co-director of the Medical Genetics Fellowship Training Programme and Professor of Paediatrics at The Johns Hopkins Hospital, Baltimore, Maryland, US.

\* \* \*

Besides the low patient figures, the imbalance between the experimental and control arms in terms of patients with the COL3A1 mutation means the results are also insufficient for FDA approval, said Dr Dietz and Dr Grossfeld.

85.     On June 25, 2019, the Marfan Foundation published an article similarly questioning the reliability of the Ong Trial and the efficacy of celiprolol, stating the following, in relevant part:[2]

 The Marfan Foundation, as well as representatives of its Professional Advisory Board, have reviewed the underlying studies of the drug and agree that celiprolol does not warrant designation as a sole approved drug for the treatment of people with vEDS (see background below). The Foundation recommends that registries of affected individuals with *COL3A1* mutations be assembled quickly to facilitate informative clinical trials.

\* \* \*

The consensus expressed at the international vascular Ehlers-Danlos syndrome meeting in Amsterdam in May 2018 emphasized the need for a large and well-controlled clinical trial of celiprolol in vEDS and the eagerness of the international medical community to assist in this effort.

86.     Close to the end of the Relevant Period, the Individual Defendants also began touting data from the Long-Term Observational Study, a study published in April 2019 in the *Journal of the American College of Cardiology* consisting of data gathered from COL3A1-positive vEDS patients between 2000 and 2017. In a press release issued by the Company on April 16,

---

[2] https://www.marfan.org/about-us/news/2019/06/25/marfan-foundation-statement-celiprolol#.XvEiRmhKiUk  (last visited June 22, 2020).

2019, the Individual Defendants quoted one of the authors of the study as stating, "The higher overall survival in patients treated with celiprolol in this long-term study in COL3A1- positive vEDS patients appears to correlate with the significant event-free survival advantage that was reported in the [Ong Trial] of celiprolol treatment in vEDS patients."

87.    However, this selective quotation lacked important context provided by the researchers of the Long-Term Observational Study, who noted that it was difficult to assess whether celiprolol actually increased the survivability of patients monitored in the study, as the study lacked a placebo-control, and therefore "other confounders" might have influenced the study's outcome.

88.    Dr. Julie De Backer and Dr. Tine De Backer, vEDS researchers who were not involved in the Long-Term Observational Study, commented on the study as follows:

> ***Whether the systematic treatment with celiprolol has an additional genuine pharmacological beneficial effect or helps ensure better follow up cannot be answered with this study.*** The only way to determine if it is celiprolol contributing to the better outcome is to conduct a randomized prospective trial comparing celiprolol to another beta-blocker in patients with molecularly confirmed vEDS.

(Emphasis added.)

89.    Despite the critical flaws described above, throughout the Relevant Period, the Individual Defendants repeatedly showcased the supposedly positive results of the Ong Trial and the Long-Term Observational Study to indicate to the public that the FDA was likely to approve EDSIVO, and had even "agreed" that further clinical trials would not be necessary.

**The NDA Approval Process**

90.    EDSIVO, like all prospective new drugs in the U.S., must receive FDA approval before it can be marketed and sold to the public. Companies seeking FDA approval of a new drug

must first prepare and submit an NDA to initiate the FDA's review process. The FDA's website

describes NDAs as follows:

> For decades, the regulation and control of new drugs in the United States has been based on the New Drug Application (NDA). Since 1938, every new drug has been the subject of an approved NDA before U.S. commercialization. The NDA application is the vehicle through which drug sponsors formally propose that the FDA approve a new pharmaceutical for sale and marketing in the U.S. The data gathered during the animal studies and human clinical trials of an Investigational New Drug (IND) become part of the NDA.

> The goals of the NDA are to provide enough information to permit FDA reviewer to reach the following key decisions:

> - Whether the drug is safe and effective in its proposed use(s), and whether the benefits of the drug outweigh the risks.

> - Whether the drug's proposed labeling (package insert) is appropriate, and what it should contain.

> - Whether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity.

> The documentation required in an NDA is supposed to tell the drug's whole story, including what happened during the clinical tests, what the ingredients of the drug are, the results of the animal studies, how the drug behaves in the body, and how it is manufactured, processed and packaged.

91.    The Company also described the NDA approval process in its 2019 10-K as

follows:

> The FDA is required to conduct a preliminary review of an NDA within the first 60 days after submission, before accepting it for filing, to determine whether it is sufficiently complete to permit substantive review. The FDA may accept the NDA for filing, potentially refuse to file the NDA due to deficiencies but work with the applicant to rectify the deficiencies (in which case the NDA is filed upon resolution of the deficiencies) or refuse to file the NDA. The FDA must notify the applicant of a refusal to file a decision within 60 days after the original receipt date of the application. If the FDA refuses to file the NDA the applicant may resubmit the NDA with the deficiencies addressed. The resubmitted NDA is considered a new application subject to a new six- or ten-month review goal, as described below. If the NDA is resubmitted for the same product (by the same person) a new application fee will not be required. The resubmitted application is also subject to

the 60-day review before the FDA accepts it for filing. Once an NDA is accepted for filing, the FDA begins an in-depth substantive review. Under the Prescription Drug User Fee Act ("PDUFA") and the FDA's commitments under the current PDUFA Reauthorization Act, the FDA has a goal of reviewing and acting on 90% of standard non-priority NDA applications within six or ten months from the filing date of the NDA.

The FDA reviews an NDA to determine, among other things, whether the drug is safe and effective for its intended use and whether the facility in which it is manufactured, processed, packaged or held meets standards designed to assure the product's continued safety, quality and purity. The FDA is required to refer an application for a novel drug or class to an advisory committee or explain why such referral was not made. An advisory committee is a panel of independent experts, including clinicians and other scientific experts, that reviews, evaluates and provides a recommendation in response to specific questions raised by the FDA, which may include whether the application should be approved and under what conditions. The FDA is not bound by the recommendations of an advisory committee, but it considers such recommendations carefully when making decisions.

\* \* \*

After the FDA evaluates the NDA and conducts its inspections, it may issue an approval letter or a Complete Response Letter. An approval letter authorizes commercial marketing of the drug subject to specific prescribing information for specific indication(s) and, if applicable, specific post-approval requirements. A Complete Response Letter indicates that the review cycle of the application is complete but the application is not ready for approval. After receiving a Complete Response Letter, the applicant must decide within twelve months (subject to extension), if it plans to resubmit the NDA addressing the deficiencies identified by the FDA in the Complete Response Letter, withdraw the NDA, or request an opportunity for a hearing to challenge the FDA's determination. A Complete Response Letter may require additional clinical data and/or an additional pivotal Phase 3 clinical trial(s), and/or other significant, expensive and time-consuming requirements related to clinical trials, nonclinical studies or manufacturing. Even if such data are submitted, the FDA may ultimately decide that the data in the NDA does not satisfy the criteria for approval. Data from clinical trials are not always conclusive and the FDA may interpret this data differently than we interpret the data.

92.    The FDA also allows for a "priority review" designation for certain drugs. Priority review status expedites the timeline by which the FDA will review a given drug's NDA, but is not otherwise an indicator of whether or not a given drug is likely to receive FDA approval. The FDA's website described the priority review designation as follows:

A *Priority Review* designation will direct overall attention and resources to the evaluation of applications for drugs that, if approved, would be significant improvements in the safety or effectiveness of the treatment, diagnosis, or prevention of serious conditions when compared to standard applications.

Significant improvement may be demonstrated by the following examples:

- evidence of increased effectiveness in treatment, prevention, or diagnosis of condition;

- elimination or substantial reduction of a treatment-limiting drug reaction;

- documented enhancement of patient compliance that is expected to lead to an improvement in serious outcomes; or

- evidence of safety and effectiveness in a new subpopulation.

FDA decides on the review designation for every application. However, an applicant may expressly request priority review as described in the Guidance for Industry Expedited Programs for Serious Conditions – Drugs and Biologics. It does not affect the length of the clinical trial period. FDA informs the applicant of a Priority Review designation within 60 days of the receipt of the original BLA, NDA, or efficacy supplement. Designation of a drug as "Priority" does not alter the scientific/medical standard for approval or the quality of evidence necessary.

93.     From September 2017 onward, the Individual Defendants repeatedly signaled to the market that FDA approval of EDSIVO was all but inevitable, including by representing that the FDA was working closely with Acer to prepare the EDSIVO NDA, and particularly, that the FDA has agreed during a September 2015 meeting that "additional clinical development is not needed." Later in the Relevant Period, the Individual Defendants would further clarify this description of the FDA's so-called "agreement," stating that more specifically, the FDA has "agreed that an additional clinical trial is not likely needed." The Individual Defendants also caused the Company to make a number of senior-level hires throughout the Relevant Period, including adding various new vice presidents to the Company's marketing and medical affairs departments, "[a]s part of the pre-commercial preparation" for EDSIVO.

94.     Yet, as described herein, and as the Individual Defendants were likely aware, the FDA hardly would have considered the Ong Trial adequate to support approval of EDSIVO, and accordingly, was hardly likely to approve EDSIVO's NDA.

**False and Misleading Statements**

***September 25, 2017 Press Release***

95.     On September 25, 2017, the Company issued a press release announcing purported positive results from the Ong Trial, and describing the Ong trial as, among other things, a "robust clinical study," stating the following:

> Cambridge, MA – Acer Therapeutics Inc., (Nasdaq: ACER), a pharmaceutical company focused on the acquisition, development and commercialization of therapies for serious rare and ultra-rare diseases with critical unmet medical need, ***today announced positive results from the pivotal clinical trial of EDSIVO™ (celiprolol) for the treatment of vascular Ehlers-Danlos Syndrome (vEDS). Acer's retrospective source verified analysis of the trial data, including the primary and secondary endpoints, confirmed the data from a previously published randomized controlled clinical study of celiprolol(1). Acer will use this pivotal clinical data to support a New Drug Application (NDA) regulatory filing in the U.S. in the first half of 2018***. Ehlers-Danlos Syndrome (EDS) is a group of hereditary disorders of connective tissue. vEDS is the most severe subtype where patients suffer from life threatening arterial dissections and ruptures, as well as intestinal and uterine ruptures.  There are currently no FDA approved therapies for vEDS(2). "We have studied celiprolol for nearly two decades in vEDS patients and this is the only drug to ever demonstrate a clinical benefit in this difficult to treat patient population in a randomized, controlled clinical study," said Pierre Boutouyrie M.D., Ph.D., co-director of the clinical pharmacology service at the Georges-Pompidou European Hospital, Greater Paris University Hospitals (AP-HP) and Principal Investigator for the published celiprolol study. "Having established celiprolol as the standard of care in France for vEDS patients, we are excited to collaborate with Acer to help bring celiprolol to U.S. patients who are suffering from this devastating, life-threatening disease." ***The previously completed European study, published on October 30, 2010, in The Lancet, was stopped early having achieved statistical significance in its primary endpoints, with arterial dissection or rupture affecting 5 (20%) celiprolol patients and 14 (50%) subjects in the non-treated control group (hazard ratio [HR] 0.36; p-value 0.04).*** The combined primary and secondary endpoints of intestinal or uterine rupture affected 6 (24%) celiprolol patients and 17 (61%) subjects in the non-treated control group (HR 0.31; p-value 0.01). The study was conducted in 53 patients, who were randomly assigned either a twice daily treatment of celiprolol

or no treatment.  Mean duration of follow-up was 47 months prior to trial halt. "We are committed to bringing EDSIVO™ to vEDS patients who currently do not have access to this treatment," said Robert D. Steiner, M.D., Chief Medical Officer of Acer. ***"Our confirmation of the published celiprolol clinical data with an Acer-sponsored retrospective source verified analysis of the trial data represents a critical element of the clinical module in our NDA, which we are diligently building***, along with current manufacturing, non-clinical and other components of the regulatory package." "We continue to successfully rapidly advance our lead product candidate, EDSIVO™, a potential life-saving therapy for patients with vEDS, towards an NDA filing, which we expect to accomplish in the first half of 2018," said Chris Schelling, CEO and Founder of Acer. ***"In addition to source verifying a definitive Event-Free Survival endpoint from a previously completed robust clinical study, modernizing manufacturing and assembling other components of the regulatory package, we are executing on a number of key medical affairs focused initiatives for vEDS patients.***  Specifically, we are setting up Centers of Excellence to optimize patient care, and intend to develop a prospective vEDS Patient Registry and provide integrated care support programs."

(Emphasis added.)

### November 13, 2017 Press Release

96.     On November 13, 2017, the Company issued a press release containing the Company's financial results for the fiscal quarter ended September 30, 2017. The press release quoted Defendant Schelling, who commented on the development of EDSIVO as follows:

"The third quarter was transformative for Acer. We became a public Nasdaq-listed company, closed a concurrent financing ***and announced positive results from our pivotal clinical trial of EDSIVO™, each a critical step in bringing us closer to our goal of becoming a leading pharmaceutical company that acquires, develops and commercializes therapies for the treatment of patients with serious rare and ultra-rare diseases with critical unmet medical need,"*** said Chris Schelling, CEO and Founder of Acer. ***"We continue to successfully advance our lead product candidate, EDSIVO™, a potential life-saving therapy for patients with vEDS***. We believe that our current cash position will allow us to advance EDSIVO™ through NDA submission with the FDA in the first half of 2018. As a public company, we look forward to advancing and expanding our pipeline with the goal of bringing multiple products to patients over the next several years."

(Emphasis added.)

### November 13, 2017 Form 10-Q

97.     Also on November 13, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2017 with the SEC (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendant Palmin, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Schelling and Palmin attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

98.     The 3Q17 10-Q stated the following regarding the Company's internal controls:

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed by us in the reports that we file or submit to the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized, and reported within the time periods specified by the Securities and Exchange Commission's rules and forms, and that information is accumulated and communicated to our management, including our principal executive officer and principal financial officer (whom we refer to in this periodic report as our Certifying Officers), as appropriate to allow timely decisions regarding required disclosure. Our management evaluated, with the participation of our Certifying Officers, the effectiveness of our disclosure controls and procedures as of September 30, 2017, pursuant to Rule 13a-15(b) under the Securities Exchange Act. Based upon that evaluation, our Certifying Officers concluded that, as of September 30, 2017, our disclosure controls and procedures were effective.

* * *

There were no changes in our internal control over financial reporting that occurred during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### December 2017 Offering Documents

99.     On December 11, 2017, the Company filed a preliminary prospectus supplement on Form 424B3 with the SEC in connection with the Company's planned December 2017 Offering (the "December 11, 2017 Form 424B3"). Subsequently, on December 12, 2017, the Company filed an additional preliminary prospectus supplement on Form 424B3 with the SEC (the "December

12, 2017 Form 424B3," and together with the December 11, 2017 Form 424B3, the "December 2017 Offering Documents"). The December 2017 Offering Documents described the Company's purported meeting with the FDA concerning EDSIVO, stating the following:

> *In September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO™. At that meeting, the FDA agreed that additional clinical development is not needed and stated that we may submit a 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS.* In addition, the FDA advised us that no significant additional work would be required for the chemistry, manufacturing and controls, nonclinical or pharmacology sections of the NDA. The FDA also indicated to us at that time that it expected that the 505(b)(2) NDA for EDSIVO™ would qualify for priority review, which provides an expedited six-month review cycle, instead of the traditional ten-month cycle, for a drug that treats a serious condition and demonstrates the potential to be a significant improvement in safety or effectiveness of the treatment, prevention, or diagnosis of the condition. The FDA determines whether an application will receive priority review at the time the application is submitted. We expect to submit to the FDA the 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS in the first half of 2018.

(Emphasis added.)

100.     In connection with the December 2017 Offering, the Company sold over one million shares of stock and raised approximately $12.5 million.

### March 7, 2018 Press Release

101.     On March 7, 2018, the Company issued a press release containing the Company's financial results for the fiscal quarter and full year ended December 31, 2017. The press release included a section on "2017 and Recent Highlights," which discussed purported positive results from the Company's EDSIVO trials as follows:

> Announced positive results from the pivotal clinical trial of EDSIVO™ (celiprolol) for the treatment of vEDS. Our retrospective source-verified analysis of the trial data, including the primary and secondary endpoints, confirmed the data from a previously published randomized controlled clinical study of celiprolol(1). We plan to discuss these key data during a pre-NDA meeting with the FDA in the second quarter of 2018.

### March 7, 2018 Form 10-K

102.    Also on March 7, 2018, the Company filed its annual report on Form 10-K for the

fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants

Schelling, Palmin, Amello, Aselage, Birner, Dunn, Griffin, and Marengere, and contained SOX

certifications signed by Defendants Schelling and Palmin attesting to the accuracy of the financial

statements contained therein, the disclosure of any material changes to the Company's internal

controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

103.    The 2017 10-K stated the following with respect to the Company's September 2015

meeting with the FDA concerning EDSIVO:

> ***In September 2015, we met with the FDA to discuss the existing clinical data for
> EDSIVO™. At that meeting, the FDA agreed that an additional clinical trial is
> not likely needed and stated that we may submit a 505(b)(2) NDA for EDSIVO™
> for the treatment of vEDS.*** The FDA indicated to us at that time that it expected
> that the 505(b)(2) NDA for EDSIVO™ is likely to qualify for priority
> review. Priority review provides an expedited six-month review cycle after
> acceptance of the NDA for filing, instead of the traditional ten-month review cycle,
> for drugs that treat a serious condition and demonstrate the potential to be a
> significant improvement in safety or effectiveness of the treatment, prevention, or
> diagnosis of the condition. The FDA determines whether an application will receive
> priority review at the time the application is accepted for filing.

(Emphasis added.)

104.    The 2017 10-K also stated the following regarding the Company's internal controls:

> Our management is responsible for establishing and maintaining adequate internal
> control over financial reporting, as such term is defined in Exchange Act Rules 13a-
> 15(f) and 15d-15(f). Under the supervision and with the participation of our
> management, including our Chief Executive Officer and Chief Financial Officer,
> we conducted an evaluation of the effectiveness of our internal control over
> financial reporting based on the framework in *Internal Control—Integrated
> Framework* issued by the Committee of Sponsoring Organizations of the Treadway
> Commission (COSO).

> Based on our evaluation under the framework in *Internal Control—Integrated
> Framework* issued by COSO, our management concluded that our internal control
> over financial reporting was effective as of December 31, 2017 in providing
> reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

* * *

There was no change in internal control over financial reporting (as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during our fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### *April 9, 2018 Proxy Statement*

105.    On April 9, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Schelling, Amello, Aselage, Birner, Dunn, Griffin, and Marengere solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

106.    The 2018 Proxy Statement was false and misleading because, despite noting that the Company maintains procedures regarding "corporate governance and ethical conduct," such procedures, including the Code of Ethics, were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

107.    The 2018 Proxy Statement also called for shareholder approval of, among other things, the Acer Therapeutics Inc. 2018 Stock Incentive Plan (the "2018 Stock Incentive Plan"), which would authorize the Company to reserve 500,000 shares of Company stock, in addition to shares of Company stock subject to outstanding awards under prior stock incentive plans, to be issued to the Company's officers and directors in connection with performance-based awards.

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

108.     The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) The Ong Trial was substantially biased and underpowered, and would be inadequate to support FDA approval of EDSIVO; (2) the FDA had not "agreed" that further clinical trials for EDSIVO were not needed for the approval of EDSIVO's NDA; (3) due to the foregoing, it was highly unlikely that EDSIVO's NDA would ultimately be approved; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

109.     As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders approved the 2018 Stock Incentive Plan.

### *May 14, 2018 Form 10-Q*

110.     On May 14, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 with the SEC (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendant Palmin, and contained SOX certifications signed by Defendants Schelling and Palmin attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

111.     The 1Q18 10-Q stated the following regarding the Company's internal controls:

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed by us in the reports that we file or submit to the SEC under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized, and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to our management, including our principal executive officer and principal financial officer (whom we refer to in this periodic report as our Certifying Officers), as appropriate to allow timely decisions regarding required disclosure. Our management evaluated, with the participation of our Certifying Officers, the effectiveness of our disclosure controls and procedures as of March 31, 2018, pursuant to Rule 13a-15(b) under the Securities Exchange Act. Based upon that

evaluation, our Certifying Officers concluded that, as of March 31, 2018, our disclosure controls and procedures were effective.

* * *

There were no changes in our internal control over financial reporting that occurred during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *August 2018 Offering Documents*

112. On July 31, 2018, the Company filed a preliminary prospectus supplement on Form 424B3 with the SEC in connection with the Company's planned August 2018 Offering (the "July 31, 2018 Form 424B3"). Subsequently, on August 1, 2018, the Company filed a preliminary prospectus supplement on Form 424B2 with the SEC (the "August 1, 2018 Form 424B2," and together with the July 31, 2018 Form 424B3, the "August 2018 Offering Documents"). Like the December 2017 Offering Documents and the 2017 10-K, the August 2018 Offering Documents described the Company's meeting with the FDA concerning EDSIVO as follows:

> ***In September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO™. At that meeting, the FDA agreed that additional clinical development is not needed and stated that we may submit a 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS.*** In addition, the FDA advised us that no significant additional work would be required for the chemistry, manufacturing and controls, nonclinical or pharmacology sections of the NDA. The FDA also indicated to us at that time that it expected that the 505(b)(2) NDA for EDSIVO™ would qualify for priority review, which provides an expedited six-month review cycle, instead of the traditional 10-month cycle, for a drug that treats a serious condition and demonstrates the potential to be a significant improvement in safety or effectiveness of the treatment, prevention, or diagnosis of the condition. The FDA determines whether an application will receive priority review at the time the application is submitted. We expect to submit to the FDA the 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS in the first half of 2018.

(Emphasis added.)

113. In connection with the August 2018 Offering, the Company sold over 2.5 million shares of stock and raised approximately $46 million.

### *August 13, 2018 Press Release*

114.    On August 13, 2018, the Company issued a press release containing the Company's

financial results for the fiscal quarter ended June 30, 2018. In a section describing "Second Quarter

2018 and Recent Highlights," the press release commented on the Company's meetings with the

FDA, and the Company's plans for submission of the EDSIVO NDA as follows:

- Held a Type C clinical meeting and a Type B (pre-NDA) meeting with the FDA in June 2018

- Presented celiprolol vEDS Patient Registry data to the FDA at the Type C meeting; if published, it will be included in support of NDA but is not rate-limiting to submission of NDA

                                    * * *

- Potential publication of celiprolol vEDS Patient Registry data; the manuscript is currently under peer review

- Targeting NDA submission to the FDA for EDSIVO™ for the treatment of vEDS in early fourth quarter of 2018

### *August 13, 2018 Form 10-Q*

115.    Also on August 13, 2018, the Company filed its quarterly report on Form 10-Q for

the fiscal quarter ended June 30, 2018 with the SEC (the "2Q18 10-Q"). The 2Q18 10-Q was

signed by Defendant Palmin, and contained SOX certifications signed by Defendants Schelling

and Palmin attesting to the accuracy of the financial statements contained therein, the disclosure

of any material changes to the Company's internal controls, and the disclosure of any fraud

committed by the Company, its officers, or its directors.

116.    The 2Q18 10-Q stated the following regarding the Company's internal controls:

We maintain disclosure controls and procedures that are designed to ensure that
information required to be disclosed by us in the reports that we file or submit to
the SEC under the Securities Exchange Act of 1934, as amended, is recorded,
processed, summarized, and reported within the time periods specified by the
SEC's rules and forms, and that information is accumulated and communicated to
our management, including our principal executive officer and principal financial

38

officer (whom we refer to in this periodic report as our Certifying Officers), as appropriate to allow timely decisions regarding required disclosure. Our management evaluated, with the participation of our Certifying Officers, the effectiveness of our disclosure controls and procedures as of June 30, 2018, pursuant to Rule 13a-15(b) under the Securities Exchange Act. Based upon that evaluation, our Certifying Officers concluded that, as of June 30, 2018, our disclosure controls and procedures were effective.

\* \* \*

There were no changes in our internal control over financial reporting that occurred during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *November 9, 2018 Form 10-Q*

117.    On November 9, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 with the SEC (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendant Palmin, and contained SOX certifications signed by Defendants Schelling and Palmin attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

118.    The 3Q18 10-Q stated the following regarding the Company's internal controls:

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed by us in the reports that we file or submit to the SEC under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized, and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to our management, including our principal executive officer and principal financial officer (whom we refer to in this periodic report as our Certifying Officers), as appropriate to allow timely decisions regarding required disclosure. Our management evaluated, with the participation of our Certifying Officers, the effectiveness of our disclosure controls and procedures as of September 30, 2018, pursuant to Rule 13a-15(b) under the Securities Exchange Act. Based upon that evaluation, our Certifying Officers concluded that, as of September 30, 2018, our disclosure controls and procedures were effective.

\* \* \*

There were no changes in our internal control over financial reporting that occurred during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**March 7, 2019 Form 10-K**

119.    On March 7, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Schelling, Palmin, Amello, Aselage, Birner, Dunn, Griffin, and Marengere, and contained SOX certifications signed by Defendants Schelling and Palmin attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

120.    The 2018 10-K stated the following regarding the Company's internal controls:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

Based on our evaluation under the framework in *Internal Control—Integrated Framework* issued by COSO, our management concluded that our internal control over financial reporting was effective as of December 31, 2018 in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

\* \* \*

There was no change in internal control over financial reporting (as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during our fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**April 12, 2019 Proxy Statement**

121.    On April 12, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Schelling, Amello, Aselage, Birner, Dunn, Griffin, and Marengere solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

122.    The 2019 Proxy Statement was false and misleading because, despite noting that the Company maintains procedures regarding "corporate governance and ethical conduct," such procedures, including the Code of Ethics, were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

123.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) The Ong Trial was substantially biased and underpowered, and would be inadequate to support FDA approval of EDSIVO; (2) the FDA had not "agreed" that further clinical trials for EDSIVO were not needed for the approval of EDSIVO's NDA; (3) due to the foregoing, it was highly unlikely that EDSIVO's NDA would ultimately be approved; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### April 16, 2019 Press Release

124.    On April 16, 2019, the Company issued a press release touting the results of the Long-Term Observational Study in support of celiprolol, stating the following:

> The authors concluded that in this large, long-term cohort study, vEDS patients had a higher survival rate than expected relative to the known natural history of the disease and a lower annual occurrence of arterial complications, and that celiprolol

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

use was potentially associated with these significant improvements in clinical outcomes.

"The higher overall survival in patients treated with celiprolol in this long-term study in COL3A1-positive vEDS patients appears to correlate with the significant event-free survival advantage that was reported in the Ong, et al. study of celiprolol treatment in vEDS patients (2)," said Michael Frank, MD, clinical investigator from the Paris group and first author of the publication.

"We are pleased to see this publication from the vEDS clinical investigator group in Paris which provides patients and physicians with a greater understanding of this chronic disease, including data suggesting a positive impact of celiprolol, which has a unique pharmacological profile," said William Andrews, MD, FACP, Chief Medical Officer of Acer.

### May 14, 2019 Press Release

125.    On May 14, 2019, the Company issued another press release describing data that purportedly supported the efficacy of celiprolol, stating the following:

Announced the publication of long-term data from a cohort of COL3A1-positive vascular Ehlers-Danlos syndrome (vEDS) patients in the Journal of the American College of Cardiology (JACC). The published data includes up to 17 years of safety data in this population, and the survival curve analysis shows that those patients not treated with celiprolol had a significantly worse outcome than celiprolol-treated patients. The authors also observed a relative decrease in hospitalization rates for acute arterial events during the time period in which the majority of patients were on celiprolol, suggesting a positive effect of celiprolol on the incidence and/or severity of new arterial events.

126.    The statements referenced in ¶¶ 95–99, 101–104, 110–112, 114–120, and 124–125 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) The Ong Trial was substantially biased and underpowered, and would be inadequate to support FDA approval of EDSIVO; (2) The Long-Term Observational study into celiprolol was significantly limited, and would likewise be inadequate to support FDA approval of EDSIVO; (3) the FDA had not "agreed" that further clinical trials for EDSIVO were not needed for the approval of EDSIVO's NDA; (4) due to the foregoing, it was highly unlikely that

42

EDSIVO's NDA would ultimately be approved; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

127.    On June 25, 2019, the Company issued a press release disclosing that the Company had received a complete response letter from the FDA indicating that the FDA had rejected the EDSIVO NDA. The press release stated the following, in relevant part:

> Acer Therapeutics Inc. (Nasdaq: ACER), a pharmaceutical company focused on the acquisition, development and commercialization of therapies for serious rare and life-threatening diseases with significant unmet medical needs, today announced it has received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA) regarding its New Drug Application (NDA) for EDSIVO™ for the treatment of vascular Ehlers-Danlos syndrome (vEDS). The CRL states that it will be necessary to conduct an adequate and well-controlled trial to determine whether celiprolol reduces the risk of clinical events in patients with vEDS. Acer plans to request a meeting to discuss the FDA's response.

> "We remain committed to working closely with the FDA to fully understand its response," said Chris Schelling, CEO and Founder of Acer. "We expect to respond to the FDA in the third quarter of this year."

128.    On this news, the price of the Company's stock plunged from $19.28 per share at the close of trading on June 24, 2019, to $4.12 per share at the close of trading on June 25, 2019, representing a stunning loss in value of over 78%.

129.    That same day, Reuters issued a report on the Company and the FDA's rejection of the NDA for EDSIVO, stating the following, in relevant part:

> Acer Therapeutics Inc said on Tuesday the U.S. Food and Drug Administration declined to approve its treatment for a severe, rare genetic disorder that can cause blood vessels to fatally rupture, sending its shares plunging as much as 78%.

> * * *

> Edsivo's marketing application was based on data from an analysis of a 2010 European study involving 53 patients.

*The small group size, however, raised questions among experts about the adequacy of the trial results.*

(Emphasis added.)

130.    Subsequently, on July 5, 2019, the Company issued a press release stating that due to the FDA's rejection of the NDA for EDSIVO, the Company would undergo a "corporate restructuring," stating the following:

> Acer Therapeutics Inc. (Nasdaq: ACER), a pharmaceutical company focused on the acquisition, development and commercialization of therapies for serious rare and life-threatening diseases with significant unmet medical needs, today announced a corporate restructuring and update on its pipeline programs. Acer's headcount has been reduced from 48 to 19 employees and pre-commercial activities of EDSIVO™ (celiprolol) have been halted. The restructuring is expected to provide the resources needed for Acer to conduct its planned business operations through 2020. Acer intends to pursue discussions with the U.S. Food and Drug Administration (FDA) regarding its previously announced Complete Response Letter (CRL) for Acer's New Drug Application (NDA) for EDSIVO™ for the treatment of vascular Ehlers-Danlos syndrome (vEDS), and to continue the development of Acer's additional pipeline programs, including ACER-001 and osanetant.
>
> "While we are disappointed by the CRL, we intend to continue our dialogue with the FDA to fully understand its response and work toward our goal of approval of EDSIVO™ for confirmed COL3A1+ vEDS patients, who currently have no approved treatment options," said Chris Schelling, CEO and Founder of Acer. "Nevertheless, in light of the CRL it was necessary to reduce our expenses, extend our cash runway, and focus our resources on a potential path forward for EDSIVO™ as well as continued development of our other pipeline opportunities."

131.    On March 18, 2020, the Company issued a press release announcing that the FDA had denied the Company's appeal of the complete response letter rejecting EDSIVO's NDA. The press release indicated that the Company was evaluating "possible next steps."

## DAMAGES TO ACER

132.    As a direct and proximate result of the Individual Defendants' conduct, Acer will lose and expend many millions of dollars.

133.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its President and CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

134.    These expenditures also include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

135.    As a direct and proximate result of the Individual Defendants' conduct, Acer has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

136.    Plaintiff brings this action derivatively and for the benefit of Acer to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Acer, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, as well as the aiding and abetting thereof.

137.    Acer is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

138.    Plaintiff is, and has been at all relevant times, a shareholder of Acer. Plaintiff will adequately and fairly represent the interests of Acer in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

139.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

140.    A pre-suit demand on the Board of Acer is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants Schelling, Amello, Aselage, Dunn, and Griffin (the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

141.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

142.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

143.    Additional reasons that demand on Defendant Schelling is futile follow. Defendant Schelling is the Company's founder, and has served as the Company's President and CEO since September 2017. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Schelling with his principal occupation, and he receives handsome

compensation, including $550,000 in 2018, and $1,467,211 in 2019 for his services. Defendant Schelling was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Schelling is a defendant in the Securities Class Action. For these reasons, Defendant Schelling breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144. Additional reasons that demand on Defendant Amello is futile follow. Defendant Amello has served as a Company director since September 2017. He also serves as a member of the Company's Audit Committee. Defendant Amello has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Amello signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Amello breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145. Additional reasons that demand on Defendant Aselage is futile follow. Defendant Aselage has served as the Company's Chairman of the Board since September 2017. He also serves

as the Chair of the Company's Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. Defendant Aselage has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Aselage signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Aselage breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Dunn is futile follow. Defendant Dunn has served as a Company director since September 2017. He also serves as the Chair of the Company's Nominating and Corporate Governance Committee, and as a member of the Audit Committee. Defendant Dunn has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Dunn signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Dunn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.     Additional reasons that demand on Defendant Griffin is futile follow. Defendant Griffin has served as a Company director since September 2017. She also serves as the Chair of the Company's Audit Committee, and as a member of the Compensation Committee. Defendant Griffin has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Griffin signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Griffin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

148.     Additional reasons that demand on the Board is futile follow.

149.     Defendants Amello, Dunn, and Griffin (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's financial reporting process, the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

150.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Schelling and Aselage both served in a number of senior roles at BioMarin Pharmaceutical Inc. between 2006 and 2012, including as Executive Director of Strategic Marketing and as Executive Vice President and Chief Business Officer, respectively. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

151.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's involvement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

152.    Acer has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Acer any part of the damages Acer suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

153.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

154.    The acts complained of herein constitute violations of fiduciary duties owed by Acer's officers and directors, and these acts are incapable of ratification.

155.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Acer. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Acer, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

156.    If there is no directors' and officers' liability insurance, then the Directors will not cause Acer to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

157.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

158.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

159.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

160.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

161.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

162.    Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) The Ong Trial was substantially biased and underpowered, and would be inadequate to support FDA approval of EDSIVO; (2) the FDA had not "agreed" that further clinical trials for EDSIVO were not needed for the approval of EDSIVO's NDA; (3) due to the foregoing, it was highly unlikely that EDSIVO's NDA would ultimately be approved; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

163.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

164.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

165.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and

omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to: (1) with respect to the 2018 Proxy Statement, approval of the reincorporation of the Company as a Delaware corporation, approval of the 2018 Stock Incentive Plan, and approval of amendments to the Company's Certificate of Incorporation pertaining to shareholder action at certain meetings, future amendments to the Company's Certificate of Incorporation and Bylaws, and the implementation of a forum selection clause, among other things; (2) with respect to the 2019 Proxy Statement, advisory approval of executive compensation and advisory approval of the frequency of future advisory votes on executive compensation; and (3) with respect to both Proxy Statements, election of directors and ratification of an independent auditor.

166.    The false and misleading elements of the Proxy Statements led to the approval of the 2018 Stock Incentive Plan and to the re-election of Defendants Schelling, Amello, Aselage, Birner, Dunn, Griffin, and Marengere, which allowed them to continue breaching their fiduciary duties to Acer.

167.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

168.    Plaintiff on behalf of Acer has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Acer's business and affairs.

171.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Acer.

173.     In breach of their fiduciary duties owed to Acer, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) The Ong Trial was substantially biased and underpowered, and would be inadequate to support FDA approval of EDSIVO; (2) The Long-Term Observational study into celiprolol was significantly limited, and would likewise be inadequate to support FDA approval of EDSIVO; (3) the FDA had not "agreed" that further clinical trials for EDSIVO were not needed for the approval of EDSIVO's NDA; (4) due to the foregoing, it was highly unlikely that EDSIVO's NDA would ultimately be approved; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

174.     The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

175.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

176.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Acer's securities.

177.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Acer's securities.

178.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Acer has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180.     Plaintiff on behalf of Acer has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Unjust Enrichment**

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Acer.

183.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, or received profits, bonuses, stock options, or similar compensation from Acer that was tied to the performance or artificially inflated valuation of Acer, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

184.    Plaintiff, as a shareholder and a representative of Acer, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

185.    Plaintiff on behalf of Acer has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants for Abuse of Control**

186.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Acer, for which they are legally responsible.

188.     As a direct and proximate result of the Individual Defendants' abuse of control, Acer has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Acer has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

189.     Plaintiff on behalf of Acer has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

190.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Acer in a manner consistent with the operations of a publicly-held corporation.

192.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Acer has sustained and will continue to sustain significant damages.

193.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

194.     Plaintiff on behalf of Acer has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

195.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

197.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

198.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

199.    Plaintiff on behalf of Acer has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Acer, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Acer;

(c)    Determining and awarding to Acer the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Acer and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Acer and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions

as may be necessary to ensure proper corporate governance policies:

     1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

     2. a provision to permit the shareholders of Acer to nominate at least three candidates for election to the Board; and

     3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

     (e)    Awarding Acer restitution from Individual Defendants, and each of them;

     (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

     (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 22, 2020          Respectfully submitted,

          **THE BROWN LAW FIRM, P.C.**

          */s/ Timothy Brown*
          Timothy Brown
          240 Townsend Square
          Oyster Bay, New York 11771
          Telephone: (516) 922-5427
          Facsimile: (516) 344-6204
          Email: tbrown@thebrownlawfirm.net

          **PAWAR LAW GROUP, P.C.**
          Vik Pawar
          20 Vesey Street, Suite 1210
          New York, NY 10007

Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

*Counsel for Plaintiff*

## VERIFICATION

I, Stephen King am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __th day of __6/22/2020__, 2020.

_DocuSigned by:_

_Stephen King_

_031B8E5CA11B43D..._

Stephen King